1

**GUTRIDE SAFIER LLP**
SETH A. SAFIER (State Bar No. 197427)

2

MARIE A. MCCRARY (State Bar No. 262670)
HAYLEY REYNOLDS (State Bar No. 306427)

3

100 Pine Street, Suite 1250
San Francisco, CA 94111

4

Telephone: (415) 639-9090

5

Facsimile:  (415) 449-6469

6

Attorneys for Plaintiffs

7

UNITED STATES DISTRICT COURT FOR THE

8

NORTHERN DISTRICT OF CALIFORNIA

9

10

LISA STARRATT and THOMAS SIMMONS, as individuals, on behalf of themselves, the general public and those similarly situated,

11

12

Plaintiffs,

13

v.

14

15

FERMENTED SCIENCES, INC.,

16

Defendant.

CASE NO.

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING; FRAUD, DECEIT, AND/OR MISREPRESENTATION; UNFAIR BUSINESS PRACTICES; AND UNJUST ENRICHMENT**

JURY TRIAL DEMANDED

17

18

19

20

21

22

23

24

25

26

27

28

-1-

Class Action Complaint

**INTRODUCTION**

1.      Plaintiffs Lisa Starratt and Thomas Simmons, by and through their counsel, bring this class action against Fermented Sciences, Inc. d/b/a Flying Embers ("Defendant") to seek redress for Defendant's deceptive and unlawful practices in labeling and marketing its Flying Embers Hard Seltzer.

2.      Consumers are increasingly interested in getting health benefits from their food and drink. Consumers are attracted to "better for you" products that are healthier than other alternatives in food and beverage categories that are not typically healthy (or even unhealthy). To make healthy choices, consumers rely on food and drink product labels.

3.      Intending to profit from consumers' increasing desire to consume healthy food and drink, Defendant fortified its alcoholic beverage by sprinkling nutrients into a beverage that is lawfully required to disclose harmful health effects. 27 U.S.C. § 215. Of course, adding an insignificant amount of nutrients to an alcoholic beverage will do little to overcome the harmful effects of alcohol.

4.      But Defendant did just this. Defendant fortified its Flying Embers Hard Seltzers with an insignificant amount of Vitamin C and probiotics, and then promoted on the labels and advertising that the seltzers contained "ANTIOXIDANT VIT C + LIVE PROBIOTICS" and were "BREWED WITH SUPERFRUITS." Defendant's campaign is both misleading and dangerous to consumers. It is also unlawful, as Defendant's labels violate FDA regulations and policies acknowledging such danger.

5.      Accordingly, Defendant's manufacturing, labeling, and advertising of the Flying Embers Hard Seltzers as containing "ANTIOXIDANT VIT C + LIVE PROBIOTICS" and "BREWED WITH SUPERFRUITS" and the other representations detailed herein are unlawful, misleading, and designed to deceive consumers into purchasing the Flying Embers Hard Seltzers. Plaintiffs bring this action to stop Defendant's misleading practices.

**PARTIES**

6.      Lisa Starratt ("Plaintiff") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Walnut Creek, California.

7.      Thomas Simmons ("Plaintiff") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Van Nuys, California.

8.      Defendant Fermented Sciences, Inc. is a corporation existing under the laws of the State of California, having its principal place of business in Ventura, California.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and at least one plaintiff and Defendant are citizens of different states.

10.      The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derive substantial revenue from products provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

12.      In accordance with California Civil Code Section 1780(d), Plaintiff Starratt concurrently files herewith a declaration establishing that, at various times throughout the class period, she purchased Flying Embers Hard Seltzer at a Total Wine in Pleasant Hill, California. (Plaintiff's declaration is attached hereto as Exhibit A.)

13.      Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### Defendant's Products

14.      Defendant manufactures, distributes, markets, advertises, and sells a variety of hard seltzers under the brand name "Flying Embers."

15.      Hard seltzers are carbonated, alcoholic beverages, mainly derived from either a brewed sugar base or brewed malt base. They are often purchased and consumed because they are

low calorie, low sugar, inexpensive alcoholic drink. They are marketed to health-conscious con-
sumers.

16.     The Flying Embers Hard Seltzers predominately, uniformly, and consistently state
on the principal display panel of the product labels that they are made with "ANTIOXIDANT
VIT C + LIVE PROBIOTICS" and "BREWED WITH SUPERFRUITS." Flying Embers Hard
Seltzers come in a variety of flavors, including Pineapple Cayenne, Watermelon Chili, Guava
Jalapeño, Clementine Hibiscus, Black Cherry Rose, and Passionfruit Elderflower. These products,
and any other flavors or Flying Embers Hard Seltzers that make a claim regarding antioxidant Vi-
tamin C, probiotics, and/or superfruits will hereinafter be referred to as the "Products."

17.     The representation that the Products contain and provide antioxidant vitamin C and
live probiotics was uniformly communicated to Plaintiffs and every other person who purchased
any of the Products in California and the United States. The same or substantially similar product
label has appeared on each respective product during the entirety of the Class Period in the gen-
eral form of the following examples:




18.     The Products' front label emphasizes "ANTIOXIDANT VIT C + LIVE PROBI-
OTICS" and "BREWED WITH SUPERFRUITS."

19.     An example of the ingredients in the Products is shown below:



20.     In recent years, consumer demand for hard seltzers has exploded. In 2018, hard seltzer sales were a mere $210 million and in 2019, sales sky-rocketed to $1.2 billion with no signs of slowing.

21.     In order to distinguish Flying Embers in the bullish market of hard seltzers, Defendant has fortified the Products to distract from the severe harm that may occur from alcohol consumption. Seeking to cash in on the hard seltzer craze, Defendant has violated FDA policies and regulations and for the reasons described herein, its labels are misleading and deceptive.

**The Products Are Harmful**

22.     Federal regulations require that the Products bear the following warning: "GOVERNMENT WARNING: (1) According to the Surgeon General, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects. (2) Consumption of alcoholic beverages impairs your ability to drive a car or operate machinery, and **may cause health problems**." 27 U.S.C. § 215 (emphasis added).

23.     In enacting this requirement, Congress found that "the American public should be informed about the health hazards that may result from the consumption or abuse of alcoholic beverages."[1]

24.     The nutrient content of alcoholic beverages is usually negligible. Because they provide almost no nutrients, alcoholic beverages are considered "empty calories."[2]

25.     Over the long-term, consuming excess alcohol can also impair the body's ability to digest and utilize nutrients.[3]

26.     Alcohol is a diuretic, causing the kidneys to remove fluid from the body more quickly than normal. This process of elimination takes precedence over all other metabolic processes, including the absorption of nutrients and minerals. Thus, the Products will do little to contribute to the nutrient needs of an adult.

27.     The United States Department of Agriculture's 2020-2025 Dietary Guidelines for Americans (DGA) encourage "[a]dults who choose to drink . . . to limit daily intakes . . . so as not to exceed daily calorie limits," and cautions that, in general, "drinking less is better for health than drinking more."[4]

28.     Evidence indicates that, among those who drink, higher average alcohol consumption is associated with an increased risk of death from all causes compared with lower average alcohol consumption. Emerging evidence suggests that even drinking within the recommended

---

[1] ANTI-DRUG ABUSE ACT OF 1988, 1988 Enacted H.R. 5210, 100 Enacted H.R. 5210, 102 Stat. 4181, 4518, 100 P.L. 690, 1988 Enacted H.R. 5210, 100 Enacted H.R. 5210
[2] Lieber CS. Relationships Between Nutrition, Alcohol Use, and Liver Disease, Relationships Between Nutrition, Alcohol Use, and Liver Disease. National Institutes of Health. 2004. https://pubs.niaaa.nih.gov/publications/arh27-3/220-231.htm
[3] Lieber CS. Alcohol: its metabolism and interaction with nutrients. *Annu Rev Nutr.* 2000;20:395-430.
[4] U.S. Department of Agriculture and U.S. Department of Health and Human Services. Dietary Guidelines for Americans 2020-2025. 2020. p49. https://www.dietaryguidelines.gov/sites/default/files/2020-12/Dietary_Guidelines_for_Americans_2020-2025.pdf

limits may increase the overall risk of death from various causes, such as from several types of cancer and some forms of cardiovascular disease.[5]

29.     According to the CDC, "Excessive alcohol use is responsible for more than 95,000 deaths in the United States each year, or 261 deaths per day. These deaths shorten the lives of those who die by an average of almost 29 years, for a total of 2.8 million years of potential life lost. It is a leading cause of preventable death in the United States, and cost the nation $249 billion in 2010."[6]

30.     Worse, "[m]ore than half of alcohol-attributable deaths are due to health effects from drinking too much over time, such as various types of cancer, liver disease, and heart disease."[7]

**The Products Do Not Provide Health Benefits**

31.     Attempting to overcome the deleterious health impact of the Products, Defendant added Vitamin C to the Products and includes "ANTIOXIDANT VIT C + LIVE PROBIOTICS" and "BREWED WITH SUPERFRUITS" on the label.

32.     Scientific research suggests that isolated antioxidants, such as the vitamin C added to the Products, do not provide the same health benefits as antioxidants from a diet rich in fruits and vegetables. Antioxidants are sought because they may reduce the risk of many diseases. Antioxidants scavenge free radicals from the body cells and prevent or reduce the damage caused by oxidation. However, clinical trials indicate that individual antioxidants taken alone do not appear to have preventative effects.[8]

33.     In this regard, the United States Department of Agriculture notes that:

[a]n underlying premise of the Dietary Guidelines is that nutritional needs should be met primarily from foods and beverages— specifically, nutrient-dense foods and beverages. … Nutrient-dense

---

[5] *Id.*
[6] Centers for Disease Control and Prevention, Alcohol and Public Health, https://www.cdc.gov/alcohol/features/excessive-alcohol-deaths.html (last accessed June 29, 2022).
[7] *Id.*
[8] *See* National Institutes of Health, Office of Dietary Supplements, Vitamin C Fact Sheet for Consumers, available at https://ods.od.nih.gov/factsheets/list-all/#VitaminC.

foods and beverages provide vitamins, minerals, and other health-promoting components…[9]

34.    Moreover, consumers simply seeking to meet the RDI for vitamin C are also unlikely to experience health benefits from the Products. The National Institutes of Health confirms that vitamin C deficiency is rare, and the average American likely exceeds the RDI for vitamin C.[10] Because vitamin C is water soluble, the body does not store excess vitamin C that a human consumes, meaning the excess vitamin C will likely pass through the body.

35.    This is particularly true in the context of consuming alcohol. Alcohol is a toxin and when consumed, the body prioritizes removal of the toxin over all other processes, including metabolizing nutrients. Thus, alcohol consumption interferes with nutrient absorption, and even where a body absorbs nutrients, alcohol prevents the body from using nutrients by altering the transport, metabolism, and storage of nutrients.[11]

36.    Defendant's use of the term "live probiotics" on the Product labels further implies that the Products are healthy. Live probiotics are associated with healthy bacteria that benefits gut health. However, alcohol kills probiotics, meaning there is likely little, if any, probiotics in the drink by the time of consumption. Combined with the fact that alcohol inhibits metabolism and absorption, consumers do not receive the benefit of "live probiotics" when consuming the Products.

37.    Further, Defendants' use of the term "superfruit" on the Product labels further implies that the Products are healthy. The term "superfruit" has become an industry term to denote nutrient-dense fruits, synonymous with "healthy" and "nutritious." However, little evidence supports the claim that a dusting of superfruit powder provides benefits associated with consumption of a fresh "superfruit."

---

[9] United States Department of Agriculture, Dietary Guidelines for Americans, 2020-2025, Executive Summary, pgs. ix-x (available at https://www.dietaryguidelines.gov/).
[10] National Institutes of Health, Office of Dietary Supplements, Vitamin C Fact Sheet for Consumers, available at https://ods.od.nih.gov/factsheets/VitaminC-Consumer/ (accessed June 11, 2021).
[11] Lieber, Charles S. "Alcohol and nutrition; an overview." Alcohol Health & Research World, vol. 13, no. 3, 1989, p. 197+. *Gale Academic OneFile*, link.gale.com/apps/doc/A8191860/AONE?u=anon~4ce0ada0&sid=googleScholar&xid=296d4991. Accessed 14 July 2021.

38.     In summary, Defendant's representations "ANTIOXIDANT VIT C + LIVE PRO-BIOTICS" and "BREWED WITH SUPERFRUITS " on the Products misleads reasonable consumers into believing that the antioxidant content of the Products provides health benefits. The minimal amount of vitamin C and live probiotics in the Products will not provide consumers with the health benefits that Defendant's representations lead them to expect, and even worse, the Product is actually dangerous to consumers' health.

39.     Defendant's use of the representations "ANTIOXIDANT VIT C + LIVE PROBIOTICS" and "BREWED WITH SUPERFRUITS " and the other representations and images detailed herein in the marketing, labeling, and advertising of the Products is thus nothing more than a marketing gimmick intended to deceive consumers into purchasing the Products. Accordingly, Defendant's representations concerning the nutritional qualities, health qualities, and ingredients of the Products are misleading, deceptive, and unlawful.

**Federal and State Regulations**

40.     The Federal Food, Drug, and Cosmetics Act (the "FDCA"), 21 U.S.C. § 343(a), provides that a food is misbranded if "its labeling is false or misleading in any particular."

41.     The FDA has provided guidance that fortification of certain products, including carbonated beverages, is not appropriate. 21 C.F.R. § 104.20 (the "Fortification Policy").[12] The Fortification Policy states that "The random fortification of foods . . . could result in deceptive and misleading claims."

42.     Specifically, under the Fortification Policy, the FDA "does not encourage indiscriminate addition of nutrients to foods, nor does it consider it appropriate to fortify … snack foods such as … carbonated beverages." *See* 21 C.F.R. § 104.20(a).

43.     In a 2015 Q&A Guidance Document relating to the Fortification Policy, the FDA was unequivocal:

**B4. Is it appropriate to add vitamins and minerals to alcoholic beverages?**

---

[12] Under the U.S. Internal Revenue Code "IRC" 27 CFR Part 7, a malt-based hard seltzer is considered a malt beverage which is subject to TTB Labeling and advertising regulations, while a sugar-based hard seltzer is considered "beer" and is subject to FDA regulation. The alcohol in the Products is derived from sugar, and therefore, are subject to FDA regulations.

No. Under our fortification policy, we do not consider it appropriate to add vitamins and minerals to alcoholic beverages.

44.     The Fortification Policy defines "fortification" as "the addition of a vitamin, mineral, or protein to a food." The use of the "superfruit blend" in the Products is fortification because this ingredient is used to add Vitamin C.

45.     The Fortification Policy is a guidance that is binding in certain circumstances. For example, where a food advertises the fortification using words like "added," "plus," or other synonyms, the Policy is binding. *See* 21 C.F.R. 101.54(e).

46.     Identical federal and California laws regulate the content of labels on packaged food and drink. The requirements of the FDCA, and its labeling regulations, including those set forth in 21 C.F.R. §§ 101, 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed below are applicable nationwide to all sales of packaged food products. Additionally, no state imposes different requirements on the labeling of packaged food for sale in the United States.

47.     Under the FDCA, the term misleading is a term of art that covers labels that are technically true, but are likely to deceive consumers. Under the FDCA, if any single representation on the labeling is false or misleading, the entire food is misbranded, and no other statement in the labeling can cure a misleading statement.

48.     Further, in addition to its blanket adoption of federal labeling requirements, California has also enacted a number of laws and regulations that adopt and incorporate specific enumerated federal food laws and regulations. *See* California Health & Safety Code § 110660 (misbranded if label is false and misleading).

49.     Under California law, a food product that is "misbranded" cannot legally be manufactured, advertised, distributed, sold, or possessed. Misbranded products have no economic value and are legally worthless.

**Defendant's Marketing and Labeling of its Products Violates State and Federal Food Labeling Laws**

50.     As the FDA recognizes in its Fortification Policy, the fortification of unhealthy foods, such as alcoholic and carbonated beverages, is misleading and deceptive to consumers. The Products deceive consumers by implying health benefits, despite the fact that the alcohol in the product prohibits any possible benefits from the scant amount of nutrients in the Products. Moreover, on information and belief, the claim of live probiotics is false given the presence of alcohol in the Products that kills probiotics. The deception is further compounded by the use of the term "superfruit," which suggests that the Products, because of their nutrient content, may help consumers maintain healthy dietary practices despite federal agencies recommending limits on alcohol consumption because of the hazards associated with it. Thus, the Products are misleading and therefore misbranded.

51.     Further, the Products are required to comply with the Fortification Policy because the Products make "more" claims regulated by 21 C.F.R. § 101.54(e).

52.     The term "+" in the context of the statement ""ANTIOXIDANT VIT C + LIVE PROBIOTICS" is a synonym for "added" or "plus" because it signifies the addition of the nutrient. Where a product makes a "plus" claim, the product *must* comply with the Fortification Policy. 21 C.F.R. § 101.54(e)(ii). Therefore, the Fortification Policy is binding on the Products. 21 C.F.R. § 101.54(e).

53.     The Products violate the Fortification Policy because they are carbonated, alcoholic beverages that are fortified with the nutrient Vitamin C. Moreover, the Products do not meet any of the other conditions for fortification as provided in the Fortification Policy. See 21 C.F.R. § 104.20(b)-(e). The Products are therefore unlawfully fortified, and the Product labels contain prohibited nutritional claims. Thus, the Products are misbranded.

54.     The Products are unlawful, misbranded, and violate the Sherman Law, California Health & Safety Code § 110660, *et seq.*, because the Products' labels state that they are made "with ANTIOXIDANT VIT C + LIVE PROBIOTICS" and "BREWED WITH SUPERFRUITS," implying the Products are a healthful source of nutrients, even though FDA guidance states that

fortification of alcoholic, carbonated beverages is not appropriate and would result in misleading consumers.

55.     Defendant's marketing, advertising, and sale of the Products violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et seq.*), including but not limited to:

a.   Section 110390, which makes it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;

b.   Section 110395, which makes it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food; and

c.   Sections 110398 and 110400, which make it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised.

56.     Defendant's marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et seq.*), including, but not limited to:

a.   Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

b.   Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear food labeling is either missing or not sufficiently conspicuous);

c.   Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

d.   Section 110765, which makes it unlawful for any person to misbrand any food; and

e.   Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

57.     Defendant has violated 21 U.S.C. § 343(a), and the standards set by FDA

regulations, including, but not limited to, 21 C.F.R. § 101.65(d), which have been incorporated by reference in the Sherman Law, by fortifying the Products and misleading consumers with claims of healthfulness.

58.     A reasonable consumer would expect that the Products are a source of nutrients and probiotics, that consumption of the Products benefits physical health and that the labels would not be contrary to the policies or regulations of the State of California and/or the FDA.

59.     Consumers lack the meaningful ability to test or independently ascertain the truthfulness of Defendant's food labeling claims, especially at the point of sale. Consumers would not know that the Products are unlawfully fortified and unlawfully labeled. Its discovery requires investigation well beyond the grocery store aisle and knowledge of FDA regulations and food chemistry beyond that of the average consumer. An average consumer does not have the specialized knowledge necessary to ascertain that the deleterious effects of alcohol overtime will not be overcome by the fortification of the Products with scant amounts of Vitamin C or that the alcohol in the beverages will interfere with the metabolism of the vitamin C and probiotics. Nor does an average consumer have the specialized knowledge to ascertain that alcohol kills probiotics, such that there are little or no probiotics in the beverages. Therefore, consumers had no reason to investigate whether the Products actually are a healthful source of nutrients as the labels claim. Thus, reasonable consumers relied on Defendant's representations regarding the nature of the Products.

60.     Defendant intends and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Defendant intends consumers to understand the label claims to communicate health benefits. Indeed, Defendant's website labels the hard seltzers as "Buzz with Benefits."[13] The Vice President of Flying Embers has said "Flying Embers, at its most basic form, stands for 'better-for-you alcohol.'"[14]

---

[13] https://www.flyingembers.com/pages/seltzer-collection (last accessed May 18, 2022).
[14] https://entertainermag.com/blog/2020/04/23/fermented-fun-flying-embers-brings-alcoholic-kombucha-to-arizona/ (last accessed May 18, 2022).

61.     Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of product packaging, as Defendant has done with the claim that the Products are a healthful source of nutrients and probiotics.

**Defendant Intends to Continue to Market the Products as Containing Antioxidant Vitamin C, Live Probiotics, and Superfruit**

62.     Because consumers pay a price premium for products that contain antioxidants, probiotics, and superfruit because such products are perceived as providing health benefits, , Defendant is able to both increase its sales and retain more profits by fortifying its Products and labeling its Products as containing nutrients, probiotics, and superfruit.

63.     Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of the Products while decreasing the sales of competitors' products that are not unlawfully fortified and labeled, and/or (ii) commanding a higher price for the Products because consumers will pay more for them due to consumers' demand for healthful products.

64.     The market for hard seltzer products is continuing to grow and expand, and because Defendant knows consumers rely on representations about the antioxidant vitamin C, probiotics, and superfruit in the Products, Defendant has an incentive to continue to make such false and misleading representations. In addition, other trends suggest that Defendant has no incentive to change its labeling practices.

65.     For example, one market analysis revealed that the market for hard seltzers is expected to grow at a 16% compound annual growth rate through 2027.[15]

66.     Defendant continues to launch new flavors and lines to diversify its portfolio to maintain its competitive edge, making it likely that Defendant will continue to unlawfully fortify the Products and misleadingly advertise the Products to perpetuate the misrepresentations regarding the healthfulness of the Products.

---

[15] https://www.toptal.com/finance/market-research-analysts/hard-seltzer-industry#:~:text=The%20global%20hard%20seltzer%20market,US%2C%20Canada%2C%20and%20Australia.

# PLAINTIFFS' EXPERIENCES

**Lisa Starratt**

67.     Plaintiff Starratt purchased variety 12-packs of Flying Embers Hard Seltzer on multiple occasions from her local retailers including BevMo in Walnut Creek and Total Wine in Pleasant Hill, California during the period of 2020-2021, including a purchase on May 14, 2021, from Total Wine in Pleasant Hill, California.

68.     Plaintiff Starratt made each of her purchases after reading and relying on Defendant's product label that advertised "ANTIOXIDANT VIT C + LIVE PROBIOTICS" and "BREWED WITH SUPERFRUITS." She believed the Products would provide physical health benefits.

69.     At the time of each of her purchases of the Products, Plaintiff Starratt did not know that the Products were unlawfully fortified and labeled and would not provide the claimed nutritional benefits. As a result of Defendant's misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to Plaintiff.

70.     Plaintiff Starratt not only purchased the Products because of the unlawful and misleading labeling, but she also paid more money for the Products than she would have paid for other or a similar alcoholic beverage product that was not unlawfully fortified and labeled with misleading nutrient content claims.

71.     Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff would not have purchased them or, at a very minimum, he would have paid less for the Products.

72.     Plaintiff Starratt continues to desire to purchase alcohol products, including those marketed and sold by Defendant. If the Products were reformulated to remove the nutrients, and labeled without the unlawful nutrient claims, Plaintiff would likely purchase the Products again in the future. Plaintiff regularly visits stores where the Products and other hard seltzers are sold.

**Thomas Simmons**

73.     Mr. Simmons purchased variety 12 packs of Flying Embers Hard Seltzer from local stores including Whole Foods in Pasadena, California in the Fall and/or Winter of 2021.

74.     Plaintiff Simmons made each of his purchases after reading and relying on Defendant's product label that advertised "ANTIOXIDANT VIT C + LIVE PROBIOTICS" and "BREWED WITH SUPERFRUITS." He believed the Products would provide physical health benefits.

75.     At the time of each of his purchases of the Products, Plaintiff Simons did not know that the Products were unlawfully fortified and labeled and would not provide the claimed nutritional benefits. As a result of Defendant's misrepresentations and omissions, the Products have no, or, at a minimum, a much lower value to Plaintiff.

76.     Plaintiff Simmons not only purchased the Products because of the unlawful and misleading labeling, but he also paid more money for the Products than he would have paid for other or a similar alcoholic beverage product that was not unlawfully fortified and labeled with misleading nutrient content claims.

77.     Had Defendant not misrepresented (by omission and commission) the true nature of the Products, Plaintiff would not have purchased them or, at a very minimum, he would have paid less for the Products.

78.     Plaintiff Simmons continues to desire to purchase alcohol products, including those marketed and sold by Defendant. If the Products were reformulated to remove the nutrients, and labeled without the unlawful nutrient claims, Plaintiff would likely purchase the Products again in the future. Plaintiff regularly visits stores where the Products and other hard seltzers are sold.

79.     Plaintiffs and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and is untrue and/or misleading under California law and the products are misbranded; therefore, the Products are worth less than what Plaintiffs and members of the Class paid for them and/or Plaintiffs and members of the Class did not receive what they reasonably intended to receive.

## **CLASS ALLEGATIONS**

80.     Plaintiffs bring this class action lawsuit on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

> 49-State Class: All persons in each state except Illinois who purchased the Products between July 1, 2018 and the present.

> California Subclass: All persons in the state of California who purchased the Products between July 1, 2018 and the present.

81.     This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed classes are easily ascertainable.

82.     Numerosity: Plaintiffs do not know the exact size the Classes, but they estimate that each is composed of more than 100 persons. The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

83.     Common Questions Predominate: This action involves common questions of law and fact to the potential classes because each class member's claim derives from the deceptive, unlawful and/or unfair statements and omissions that led consumers to believe that the Products provide health benefits as represented on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Classes to recover. The questions of law and fact common to the Classes are:

> a.   Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive and/or unlawful;

> b.   Whether Defendant's actions violate Federal and California laws invoked herein;

> c.   Whether the fortification of the Products is unlawful;

> d.   Whether labeling the Products with false and misleading claims causes them to command a price premium in the market as compared with similar products that do

not make such misrepresentations;

e.   Whether Defendant's advertising and marketing regarding the Products sold to the class members was likely to deceive reasonable consumers;

f.   Whether representations regarding the antioxidant vitamin C and probiotics in the Products are material to a reasonable consumer;

g.   Whether representations regarding the use of a superfruit in the Products are material to a reasonable consumer;

h.   Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

i.   The amount of profits and revenues earned by Defendant as a result of the conduct;

j.   Whether class and subclass members are entitled to restitution, injunctive and other equitable relief and, if so, what is the nature (and amount) of such relief; and

k.   Whether class and subclass members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

84.   Typicality: Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each member of the Classes were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

85.   Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of all class and subclass members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complains. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of class and subclass members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the classes. By prevailing on their own claims, Plaintiffs will establish Defendant's liability to all class and subclass members. Plaintiffs and their counsel have the necessary financial resources to adequately and

vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class and subclass members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class and subclass members.

86.     Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the classes to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

87.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

88.     Plaintiffs do not plead, and hereby disclaims, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiffs rely on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## PLAINTIFFS' FIRST CAUSE OF ACTION

**(Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code §
1750, *et seq.*)**
**On Behalf of Plaintiffs and the Subclass**

89.     Plaintiffs reallege and incorporate the paragraphs of this Class Action Complaint as if set forth herein.

90.     Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

91.     Plaintiffs and other class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

92.     The Products that Plaintiffs (and other similarly situated subclass members) purchased from Defendant were "goods" within the meaning of California Civil Code § 1761(a).

93.     Defendant's acts and practices, set forth in this Class Action Complaint, led customers to falsely believe that the Products provided health benefits as claimed on the product package. By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendant has violated, and continues to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), and § 1770(a)(8), of the CLRA. In violation of California Civil Code §1770(a)(2), Defendant's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation of California Civil Code §1770(a)(5), Defendant's acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendant's acts and practices constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendant has disparaged the goods, services, or business of another by false or misleading representation of fact. Finally, regarding California Civil Code §1770(a)(8), Defendant falsely or deceptively markets and advertises that, unlike other alcoholic beverage product manufacturers, it sells Products that contain antioxidant vitamin C and probiotics.

94.     Plaintiffs request that this Court enjoin Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Defendant is not restrained from engaging in these types of practices in the future, Plaintiffs and the other members of the Class will continue to suffer harm. Plaintiffs and those similarly situated have no adequate remedy at law to stop Defendant continuing practices.

95.    **CIVIL CODE § 1782 NOTICE.** Plaintiffs notices and demands that within thirty (30) days from that date of the filing of this Complaint, Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and or deceptive practices complained of herein.

96.    Should the violations herein alleged not be corrected or rectified as required by Civil Code § 1782 within 30 days with respect to all Subclass Members, Plaintiffs will seek to amend this Class Action Complaint to seek, on behalf of each Subclass Member, actual damages of at least $1,000, punitive damages, an award of $5,000 for each Subclass Member who is a disabled person or senior citizen, and restitution of any ill-gotten gains due to Defendant's acts and practices.

97.    Plaintiffs also requests that this Court award their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

### PLAINTIFFS' SECOND CAUSE OF ACTION
#### (False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))
#### On Behalf of Plaintiffs and the Subclass

98.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

99.    Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Defendant made deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

100.    Defendant made representations and statements (by omission and commission) that led reasonable customers to believe that alcoholic beverages could be healthful sources of nutrients.

101.    Plaintiffs and those similarly situated relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing the Products or paying less for them.

102.    Defendant's acts and omissions are likely to deceive the general public.

103.    Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

104.    The aforementioned practices, which Defendant used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

105.    As a direct and proximate result of such actions, Plaintiffs and the other subclass members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiffs, and those similarly situated, paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendant's false, deceptive and misleading advertising. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, Plaintiffs and those similarly situated will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

106.    Plaintiffs seek equitable relief, including restitution, with respect to their FAL claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action will not succeed. Plaintiffs and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiffs may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent

class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'").

107. Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

108. Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they are not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

### PLAINTIFFS' THIRD CAUSE OF ACTION
**(Common Law Fraud, Deceit and/or Misrepresentation)**
**On Behalf of Plaintiffs and the Class**

109. Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

110. Defendant has fraudulently and deceptively informed Plaintiffs that the Products are healthful sources of nutrients.

111. These misrepresentations and omissions were known exclusively to, and actively concealed by, Defendant, not reasonably known to Plaintiffs, and material at the time they were made. Defendant knew or should have known the composition of the Products, and knew or should have known that the fortifying the Products is disapproved by the FDA, and when done in conjunction with health claims is prohibited by the FDA, and in either instance results in misleading consumers. Defendant's misrepresentations and omissions concerned material facts

that were essential to the analysis undertaken by Plaintiffs as to whether to purchase Defendant's Products. In misleading Plaintiffs and not so informing Plaintiffs, Defendant breached its duty to them. Defendant also gained financially from, and as a result of, its breach.

112.    Plaintiffs and those similarly situated relied to their detriment on Defendant's misrepresentations and fraudulent omissions. Had Plaintiffs and those similarly situated been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

113.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and those similarly situated to alter their position to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and those similarly situated to, without limitation, purchase the Products.

114.    Plaintiffs and those similarly situated justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant.

115.    As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and those similarly situated have suffered damages, including, without limitation, the amount they paid for the Products.

116.    Defendant's conduct as described herein was wilful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiffs and those similarly situated.

**PLAINTIFFS' FOURTH CAUSE OF ACTION**
**(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.*)**
**On Behalf of Plaintiffs and the Subclass**

117.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

118.    Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continues to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the unlawful, unfair, and fraudulent

business practices outlined in this complaint.

119.    In particular, Defendant has engaged, and continues to engage, in unlawful practices by, without limitation, violating the following state and federal laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq.* and FDA regulations, including but not limited to 21 C.F.R. 104.20, and 21 C.F.R. 101.65(d), which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

120.    In particular, Defendant has engaged, and continues to engage, in unfair and fraudulent practices by, without limitation, the following: (i) misrepresenting that the Products are healthful sources of nutrients and probiotics; and (ii) fortifying its alcoholic, carbonated beverages in violation of FDA guidance and regulations.

121.    Plaintiffs and those similarly situated relied to their detriment on Defendant unlawful, unfair, and fraudulent business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

122.    Defendant's acts and omissions are likely to deceive the general public.

123.    Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

124.    The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

125.    As a direct and proximate result of such actions, Plaintiffs and the other subclass

members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiffs and those similarly situated paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendant's misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, Plaintiffs and those similarly situated will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

126.    As a direct and proximate result of such actions, Defendant has enjoyed, and continues to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

127.    Plaintiffs seek, on behalf of themselves and those similarly situated, equitable relief, including restitution for the premium and/or the full price that they and others paid to Defendant as result of Defendant's conduct. Plaintiffs and the Class lack an adequate remedy at law to obtain such relief with respect to their "unfairness" claims in this UCL cause of action, because there is no cause of action at law for "unfair" conduct. Plaintiffs and the Class similarly lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the Sherman Law (Articles 3 and 6) and the Federal laws and regulations referenced herein do not provide a direct cause of action, so Plaintiffs and the Class must allege those violations as predicate acts under the UCL to obtain relief.

128.    Plaintiffs also seeks equitable relief, including restitution, with respect to their UCL unlawfulness claims for violations of the CLRA, FAL and her UCL "fraudulent" claims. Pursuant to Federal Rule of Civil Procedure 8(e)(2), Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiffs and the Class may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show

classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiffs may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but requiring certification of UCL claim for entire class). In addition, Plaintiffs and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiffs are unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

129.    Plaintiffs seek, on behalf of themselves and those similarly situated, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

130.    Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendant from continuing to engage in the deceptive and/or unlawful trade practices complained of herein. Such misconduct by Defendant, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendant will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendant to which they were not entitled. Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

**PLAINTIFFS' FIFTH CAUSE OF ACTION**
**(Unjust Enrichment)**
**On Behalf of Plaintiffs and the Class**

131.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

132.    Plaintiffs and members of the Class conferred a benefit on the Defendant by

1    purchasing the Products.

2        133.    Defendant has been unjustly enriched in retaining the revenues from Plaintiffs' and

3    Class Members' purchases of the Products, which retention is unjust and inequitable, because

4    Defendant falsely represented that the Products are healthful sources of nutrients when, in fact,

5    the Products are not healthful and FDA guidelines provide that carbonated and alcoholic

6    beverages should not be fortified with nutrients. This harmed Plaintiffs and members of the class

7    because they paid a price premium as a result.

8        134.    Because Defendant's retention of the non-gratuitous benefit conferred on them by

9    Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution and

10   nonrestitutionary disgorgement of profits to Plaintiffs and the Class members for its unjust

11   enrichment, as ordered by the Court. Plaintiffs and those similarly situated have no adequate

12   remedy at law to obtain this relief.

13       135.    Plaintiffs, therefore, seek an order requiring Defendant to make restitution and

14   pay nonrestitutionary disgorgement of profits to his and other members of the Class.

15                              **PRAYER FOR RELIEF**

16       WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated,

17   respectfully request that the Court enter judgement against Defendant as follows:

18       A.      Certification of the proposed Classes, including appointment of Plaintiffs' counsel

19   as class counsel;

20       B.      An order temporarily and permanently enjoining Defendant from continuing the

21   unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

22       C.      An award of compensatory damages in an amount to be determined at trial, except

23   as to those causes of action where compensatory damages are not available at law;

24       D.      An award of statutory damages in an amount to be determined at trial, except as to

25   those causes of action where statutory damages are not available at law;

26       E.      An award of punitive damages in an amount to be determined at trial, except as to

27   those causes of action where punitive damages are not available at law;

28       F.      An award of treble damages, except as to those causes of action where treble

1    damages are not available at law;

2        G.      An award of restitution in an amount to be determined at trial, except as to those

3    causes of action where restitution is not available at law;

4        H.      An award of nonrestitutionary disgorgement of profits in an amount to be

5    determined at trial, except as to those causes of action where restitution is not available at law;

6        H.      An order requiring Defendant to pay both pre- and post-judgment interest on any

7    amounts awarded;

8        I.       For reasonable attorneys' fees and the costs of suit incurred; and

9        J.       For such further relief as this Court may deem just and proper.

10                          **JURY TRIAL DEMANDED**

11           Plaintiffs hereby demand a trial by jury.

12    Dated: July 1, 2022                    **GUTRIDE SAFIER LLP**

13

14

15

16           _____
17           Seth A. Safier, Esq.
             Marie McCrary, Esq.
18           Hayley Reynolds, Esq.
             100 Pine Street, Suite 1250
19           San Francisco, CA 94111

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

I, Lisa Starratt, declare:

1.      I am the Plaintiff in this action. If called upon to testify, I could and would competently testify to the matters contained herein based upon my personal knowledge.

2.      I submit this Declaration pursuant to California Civil Code § 1780(d), California Code of Civil Procedure § 2015.5, and 28 U.S.C. § 1746.

3.      I reside in Walnut Creek, California.  I purchased Flying Embers Hard Seltzer variety packs on multiple occasions in 2020 and 2021, including on May 14, 2021, from Total Wine in Pleasant Hill, California.

I declare under penalty of perjury under the laws of California and of the United States of America that the foregoing is true and correct.

Executed in Walnut Creek, California on   6/30/2022

DocuSigned by:

*LISA STARRATT*

2F13DE77C7F64DC...

Lisa Starratt

SWARTZ DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION